FORT WORTH SAND & GRAVEL CO., Inc., v. PETERS.

No. 13497.

Court of Civil Appeals of Texas. Fort Worth.

Feb. 5, 1937.

Rehearing Denied March 26, 1937.

Cantey, Hanger & McMahon, W. D. Smith, and F. T. Denny, all of Fort Worth, for appellant.

Levy & Evans, of Fort Worth, for appellee.

SPEER, Justice.

On July 3, 1928, C. C. Peters, as lessor, and Fort Worth Sand & Gravel Company, as lessee, entered into a written lease contract whereby the former let to the latter, for a term of three years, about forty acres of land along with exclusive use of a certain railway switch track on the premises, and certain other valuable rights, such as ingress and egress upon the premises; the lessor retaining only for himself and tenants the right to use the switch track for shipping livestock, farm products, and supplies.

In consideration of the lease, the lessee obligated itself to pay to lessor a royalty of ten cents per cubic yard for all gravel and sand taken from the premises, and, further, that in the event it did not take enough sand and gravel during any month that the royalties to lessor, at the price named, did not amount to $200, it would pay that amount as a minimum lease for each month the lease should remain effective, provided that, if a monthly payment of $200 should exceed the amount due lessor by virtue of the yardage removed at the agreed price, lessee should have the right to thereafter, and before the expiration of the lease, remove sand and gravel to the extent of such excess payment.

There was a further stipulation in the contract in this language: "It is understood that this lease, and the rights and privileges granted hereby shall continue for a period of three years from the date hereof, with the understanding, however, that if the sand and gravel on the premises shall become exhausted, or if either the quality or quantity thereof become such as that it cannot be mined by lessee with a reasonable

profit, in such event or events said lessee, upon giving thirty days written notice to lessor of such facts shall be entitled to terminate this lease, and thereafter all obligations of either party hereto as made by the lease shall be null and void."

The lessee began paying to lessor the minimum monthly royalty payments and continued to do so until in May, 1930, when it quit and notified the lessor in writing, as provided in the contract, that the quality and quantity of sand and gravel were not on the leased premises and declared its intention to terminate the lease.

Plaintiff C. C. Peters instituted this suit against the defendant Fort Worth Sand and Gravel Company for $2,700, alleged to be the minimum royalty promised to be paid for the unexpired term of the contract.

The defendant answered with general denial and special pleas that (a) the lease contract was entered into between the parties, each believing that there was sufficient sand and gravel on said premises of a commercial quality that it could be mined by defendant at a reasonable profit to it, but that in truth both parties were mistaken as to the quality and quantity thereof, and that it could not be mined and marketed at a reasonable profit; (b) the consideration for the lease failed because of the absence of sand and gravel on the premises in sufficient quality and quantity to enable defendant to mine it with a reasonable profit to itself; (c) before it learned the premises did not contain the sand and gravel in quality and quantity sufficient to justify its mining with a reasonable profit, it had expended in royalty payments and necessary expenses in testing same the sum of $6,374.57; that of said amount $4,700 had been paid to plaintiff in said minimum royalty payments; and (d) it pleaded the provision of the contract above quoted under which it had the right to declare the contract terminated by notifying plaintiff in writing that the quality and quantity of the sand and gravel was insufficient to enable it to mine the same with a reasonable profit to itself. Prayer was for the amount expended by defendant prior to ascertaining the premises could not be profitably operated.

A reply pleading by plaintiff was to the effect, (a) a general denial of defendant's affirmative pleas; (b) that prior to entering into the lease contract there were test holes dug on the leased premises at points and to the depth and of a character designated by the defendant for the purpose of proving the presence or absence of sand and gravel on the premises, and that by an inspection of the tests thus made defendant convinced itself of the fact suitable materials were on the premises to meet the conditions of the contract, and it did not rely upon representations made by plaintiff; (c) that defendant made payments of royalty installments each month from the date of the contract until May, 1930, and incurred the expense of stripping the soil from a portion of the premises as pleaded by it, in pursuance of the terms of the lease contract, and thereafter made no bona fide attempt to mine the sand and gravel prior to the time it breached the contract by failing to pay rentals and attempted to terminate same by the notice given plaintiff as pleaded by defendant; and (d) that the sand and gravel on the leased premises did not become exhausted but were of sufficient quality and quantity at all times that defendant, by the exercise of due diligence, could have mined the same at a reasonable profit.

The issues thus made were tried to a jury under special issues submitted by the court which, with their answers, were as follows:

"1. Do you find from a preponderance of the evidence that the sand and gravel on the premises of the plaintiff described in the lease of June 6, 1930, was of such quality that it could not have been mined by the Fort Worth Sand & Gravel Company with a reasonable profit to itself? Your answer will be in the following form, either: 'It could not have been mined by the Fort Worth Sand & Gravel Company with a reasonable profit', or 'It could have been mined by the Fort Worth Sand & Gravel Company with a reasonable profit.' Answer: It could have been mined by the Fort Worth Sand & Gravel Company with a reasonable profit.

"2. Do you find from a preponderance of the evidence that the sand and gravel on the premises of the plaintiff on June 6, 1930, was of such quantity that it could not have been mined by the Fort Worth Sand & Gravel Company with a reasonable profit to itself? Your answer will be in the following form, either: 'It could not have been mined by the Fort Worth Sand & Gravel Company with a reasonable profit' or 'It could have been mined by the Fort Worth Sand & Gravel Company with a reasonable profit.' Answer: It could have

been mined by the Fort Worth Sand & Gravel Company with a reasonable profit.

"In the event you answer either of the foregoing questions that 'It could not have been mined by the Fort Worth Sand & Gravel Company with a reasonable profit,' you need not answer any further questions, but if you have answered both of said issues 'It could have been mined by the Fort Worth Sand & Gravel Company with a reasonable profit', then answer:

"3. Do you find from a preponderance of the evidence that the Fort Worth Sand & Gravel Company, prior to June 6, 1930, used ordinary care to examine the premises to determine whether or not the sand and gravel thereon was of such quality and quantity as that they could mine same with reasonable profit? Answer: Yes.

"4. Do you find from a preponderance of the evidence that the defendant, Fort Worth Sand & Gravel Company, prior to June 6, 1930, in good faith determined, if it did so determine, that the sand and gravel on the premises of the plaintiff was of such quality or quantity that the same could not be mined by it with a reasonable profit? Answer yes or no. Answer: No."

Upon the jury verdict, the court rendered judgment, denying defendant recovery on its cross-action, and in favor of plaintiff for $3,221.25. This was the amount of unpaid royalties at $200 per month with interest from the time the installments became due. From this judgment the defendant has perfected its appeal.

At the conclusion of the testimony, and before the charge of the court was given, defendant moved for an instructed verdict, in its favor, which was overruled by the court. By propositions 3, 4, 7, 13, and 14, the defendant, for reasons therein assigned, complains of the action of the court in refusing the request. We do not believe the court was in error in overruling the motion.

Among the grounds of error assigned by defendant, in these several propositions were: (a) That plaintiff had failed to prove he had been damaged; (b) the amount of damages, if any; and (c) the court could not properly render judgment other than for defendant without proof that the value of royalties which would have accrued to plaintiff by reason of the operation of the lease would have been at least the sum of $200 per month.

The record discloses that defendant handled sand and gravel in large quantities, the greater part of which was mined with expensive machinery and loaded at the pits into railway cars for transportation into Fort Worth and in some instances to other places; that it purchased or leased lands purporting to contain sand and gravel and kept these deposits for use in the future as its need required; that it did not need the lease in controversy for immediate use at the time of the contract, and only attempted to work it in March or April of 1930 after the contract was made in 1928; that, when machinery was moved onto the lease preparatory for excavations, it was found by defendant that at the point where it undertook to mine there was no sand nor gravel in sufficient quantity and quality to justify the operations.

It does not appear that any other effort was made by defendant to ascertain if other parts of the lease contained sand and gravel of sufficient quality and quantity to justify operations. The defendant continued paying the monthly royalty up until and including May, 1930, and on June 6th of that year, notified plaintiff of its determination to end the contract.

From the terms of the contract as a whole, it is evident that defendant leased the premises on a basis of ten cents per cubic yard of sand or gravel actually taken, and that a minimum royalty of $200 per month would be paid during the life of the lease whether anything was taken from the premises or not.

There was the provision in the contract which we have above quoted, by the terms of which defendant had the right, upon the happening of the conditions therein provided, to terminate the lease. We believe that, in order to terminate the lease and relieve itself of further liability thereunder, it was necessary for the defendant to allege and prove the conditions and provisions therein had happened. It alleged this and attempted to prove it. It declared the contract terminated, and abandoned the lease, upon the theory that the provisions in the contract, under the conclusions which it had reached, justified its declaration. The defendant having abandoned the further performance, if its abandonment was not justified, the plaintiff was entitled to recover the minimum royalty

payments for the remainder of the life of the contract. We hold it was not necessary for plaintiff to make further proof of the amount of his damages than the minimum amount contracted to be paid. This being true, the court was warranted in rendering judgment for that amount, if the jury should find the defendant had wrongfully breached the contract and had abandoned the lease. The controverted questions of fact were submitted to the jury and were determined against the contention of defendant, and there was sufficient evidence to support the verdict.

It is no answer to plaintiff's right to a performance by defendant of the terms of the contract that plaintiff still had his gravel and sand, and had not been damaged by reason of defendant's act in not taking them from the leased premises and paying him therefor. In the first place, for the consideration promised by defendant, the plaintiff gave up other valuable rights by the contract, such as the use to defendant of his railway switch, which, it appears, deprived him of a chance to lease or rent his premises for mining purposes to other large concerns demanding such facilities. In the next place, all parties doubtless believing the premises contained large quantities of sand and gravel, even more than defendant would mine, provided against such a contingency by agreeing upon a minimum royalty to be paid in the event no sand and gravel should be taken at all, and from this the damages to plaintiff could be fairly determined. We can easily see, if this had been an oil or gas lease, and it had been productive and defendant had not developed it but permitted adjacent owners to develop and drain plaintiff's land, how his damages would have been a question of proof of the probable loss; but it is similar in many respects to deposits of sulphur or similar articles not capable of drainage. The Supreme Court held, in the case of Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W.(2d) 1039, 60 A.L.R. 890, in which there was a contract to pay so much per ton for sulphur mined, that the measure of damages for failure to operate the mine for a given period was the value of the agreed royalty on the amount that should have been mined during the period operations were illegally postponed, irrespective of the fact that the royalty owner still had its sulphur in the mine and would again collect royalty on it when it should be subsequently removed. We will

have occasion to further refer to the exception in the contract upon which defendant relies, under other assignments in this appeal.

Propositions 5 and 6 complain especially of the action of the court in rendering judgment on the verdict of the jury for the aggregate amount of the minimum royalty payments remaining unpaid at the time defendant declared the contract at an end, instead of submitting to the jury for determination the amount of damages, if any, sustained by plaintiff. Substantially this same question was raised in the foregoing propositions, in support of defendant's right to an instructed verdict, and what we have said with reference thereto is likewise applicable to these propositions. We hold there is no merit in them.

By special issues Nos. 1 and 2, above quoted, it will be observed that the court placed upon the defendant the burden of proof to show that on June 6, 1930 (when the defendant declared the contract terminated), the sand and gravel on the leased premises were of such quality and in such quantities they could not have been mined by defendant with a reasonable profit to itself. By its first proposition, the defendant challenges the acts of the court in thus placing the burden on it in the matters mentioned.

As we have heretofore indicated in this opinion, the contract as a whole is one of leasing certain premises for a definite period of time and for a stipulated minimum rental or royalty; but in the contract there is a provision that under certain conditions and the happening of certain events the defendant may, by the means provided therein, declare the contract at an end and be relieved from further liability thereunder. For the defendant to procure this immunity, it must plead and prove the condition has happened, entitling it to the relief.

In the case of Wooters v. International & G. N. Ry. Co., 54 Tex. 294, the court had under consideration the breach of a contract which had in it a provision that, if a certain condition or event happened, the defendant would be relieved of further liability thereon, and, with reference to the burden of alleging and proving that event did happen, the court said: "If the contingency had occurred which relieved appellant from performance of his undertaking, it devolved upon him to allege and prove it, and it was not incumbent upon

appellee to anticipate his defense by averring that the county had not issued to appellee its bonds."

In Hardy et al. v. Kansas Manufacturing Co., 18 S.W. 157, 158, our Supreme Court had a similar matter under consideration to that involved here, with reference to the burden of proving the happening of contingencies mentioned in a contract which will relieve one from liability for failing to perform, and announced as the rule controlling such matters the following: "It does not devolve upon a plaintiff to aver that a contingency named in a contract sued on, whereby a defendant would be discharged from liability, had not happened. If such a contingency has happened, it becomes the defendant to aver and prove that fact."

The same rule is adhered to, as the principles above announced, in the submission of special issues as declared in the case of Houston & T. C. Ry. Co. v. Stevenson (Tex.Com.App.) 29 S.W.(2d) 995, 999. The last-cited case did not involve the provisions of a contract, yet the rule is the same. There it was held: "When the defendant challenges the right of plaintiff to recover by reason of certain exceptions, and that by virtue of certain exceptions there is no liability on the part of defendant, and special issues based upon such exceptions are submitted to the jury upon such special issues, it is proper to instruct the jury that the burden is upon the defendant to establish them by a preponderance of the evidence."

In the case at bar, the defendant sought to be relieved of liability under the lease contract, because the contingency contained therein, which would give it such relief, had happened. Under the authorities above mentioned, it was incumbent upon the defendant to plead and assume the burden of proving the contingency had happened, and it was not error for the trial court to so instruct the jury. The assignment of error must be overruled.

■ Defendant's second proposition, which it says in the brief is based on the ninth paragraph of its motion for new trial, complaint that the court erroneously placed the burden of proof on it in the third special issue. By reference to that issue as shown above, it will be noted that the court inquired if they found by a preponderance of the evidence the defendant prior to June 6, 1930, used ordinary care to examine the premises to determine whether or not sand and gravel thereon was of such quality and quantity that it could mine the same with reasonable profit. From the issue as framed, the period prior to the entering into the contract, as well as the occasion on March or April, 1930, when defendant moved onto the premises for the purpose of mining it, were covered. The plaintiff pleaded that defendant did not use ordinary care to operate the lease, and contended it had not made a bona fide effort to carry out the contract according to its provisions. We think, therefore, that the burden of proof should have been placed on the plaintiff in an issue so worded as to elicit the jury's answer to the question. But the question was answered in the affirmative, which, in any event, was favorable to defendant, and no harm has resulted to defendant of which it can complain. For this reason, we would not disturb the judgment as rendered on that account.

■ Complaint is made that the court refused to submit to the jury a special requested charge to the effect that no duty rested upon the defendant (lessee) to operate the lease at a loss to itself; this was a general charge and required no finding of fact by the jury and the court properly overruled the request.

By another proposition, defendant insists that the court committed error for which the case should be reversed in refusing to give three special requested issues, two of which were, in effect, inquiries if the jury found from a preponderance of the evidence that defendant entered into the lease contract under the mistaken belief that sand and gravel in sufficient quantity and quality to be mined by defendant at a reasonable profit to it existed under the land in question, while the other requested issue inquired if the jury found from a preponderance of the evidence that both the plaintiff and defendant entered into the contract under the mistaken belief that the leased premises contained sand and gravel in sufficient quality and quantity to enable defendant to mine the same with a reasonable profit to itself. It is true the defendant pleaded that both parties believed that there was sand and gravel on the premises of proper quality and in sufficient quantities to enable it to mine them at a reasonable profit to itself. But in effect it further pleaded this belief was really untrue, and that all parties were mistaken.

Defendant cites as authority for its contention the case of Edwards et al. v. Trinity & B. V. Ry. Co., 54 Tex.Civ.App. 334, 118 S.W. 572, in which a writ of error was refused by the Supreme Court. We think there is a distinction between the facts involved in that case and the one here under consideration. The contract involved in the case last above cited was for the sale of sand and gravel on a designated tract of land to be mined and used for ballast on a railroad bed, and it appeared little or no investigation was made by either party as to the presence of such materials before entering into the contract. All parties to the contract were under the honest belief that suitable materials existed under the surface, and there was no provision in the contract by which either could be relieved from its performance, if named conditions, which could not be foreseen by either, should happen. Such a contract naturally carried with it the legal assumption that the subject matter was the existence of the desired materials, and in one sense there was an implied warranty on the part of the lessor that the ballast material was in fact on the premises.

■ The contract sued on in this case is clear and unambiguous in its terms, and upon its face as a whole conveys the idea that defendant is purchasing, at an agreed price, certain privileges and the sand and gravel on the leased premises; only one contingency specifically agreed upon between the parties could relieve defendant from payment of the contract price agreed upon. That was the exception quoted above. The saving clause to defendant, referred to, we believe precludes it from relying upon any implied warranty by plaintiff that the premises contained sand and gravel sufficient for any purpose, other than as specified therein; that is, "if the sand and gravel on the premises shall become exhausted, or if either the quality or quantity thereof become such as that it cannot be mined by lessee with a reasonable profit," the lessee (defendant) could, by giving the notice required in the contract, relieve itself from further liability. The language used in the exception carries the inescapable conclusion that the defendant was satisfied that the materials were there when it entered into the contract. The testimony offered supported the findings of the jury that they were there in sufficient quality and quantity that they could have been mined by defendant at a profit. None were taken out, and it must follow they were still there when defendant attempted to terminate the contract. Under such contract, it cannot be said that, even though defendant had been mistaken as to the presence of sand and gravel in quality and quantity contracted for, it could be relieved from liability until it established the conditions stipulated in the contract, under which it could be relieved, had happened.

■ Our conclusions on this point are supported by Corpus Juris, vol. 13, p. 376, § 261, cited by plaintiff, which reads: "Where the parties treat on the basis that the fact which is the subject of the agreement is doubtful, and the consequent risk each is to encounter is taken into consideration in the stipulations assented to, the contract will be valid, notwithstanding any mistake of one of the parties."

To the same effect is Black on Rescission and Cancellation, vol. 2, p. 610, cited by plaintiff in his brief, to which we do not have access.

Another case cited by plaintiff supporting his contention, which we believe is correct, is that of Texas Co. v. Hogarth Shipping Corporation, 256 U.S. 619, 41 S.Ct. 612, 614, 65 L.Ed. 1123. There the court had under consideration a contract for transportation of a charter party to a foreign port, at a given time, and on a named vessel. There was no clause in the contract providing for the happening of any contingency by which the defendant would be relieved from performance. The English government requisitioned the defendant's ship in the meantime for war purposes, and the company could not receive the party as it had contracted to do. Shipping was taken on another vessel at a higher rate, and suit was instituted for the difference in the price paid and that contracted for. In discussing the contract, the court said:

"It long has been settled * * * that where parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose and neither agrees to be responsible for its continued existence and availability the contract must be regarded as subject to an implied condition that, if before the time for performance and without the default of either party the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the

parties excused from performing it. * * * But, of course, it does not apply where the risk is fully covered by a term of the contract."

■ The general rule announced in the case from which we have just quoted is, as we construe it, in harmony with the principles announced in the Edwards v. Trinity & B. V. Ry. Co. Case, supra, but the concluding clause quoted by us we think supports the contention of plaintiff that, where the contract provides the conditions and contingencies under which one of the parties may be relieved of its performance, the assumption that the subject matter may fail because of a mistake of fact by a party is not involved. The assignments of error raising the question must be overruled.

This brings us to a consideration of the assignment challenging the action of the court in refusing to give in a charge to the jury a definition of the words "reasonable profit," as used in special issues submitted.

Article 2189, Rev.Civ.Statutes, controls this question. There it is provided for the submission of causes on special issues and, among other things, says: "In submitting special issues the court shall submit such explanations and definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict on such issues."

■ The question of when and under what conditions explanations of terms used in charges shall be explained has been the subject of much discussion by our courts; and it seems the trend of authorities is to the effect that each case must rest largely upon the facts and circumstances under which such words are used. When it is material to enable a jury to properly understand the language used in a given case, explanations are mandatory. It was held in Lee v. Wilson (Tex.Civ.App.) 91 S.W.(2d) 461, writ of error refused, such explanations and definitions were necessary whether the words and expressions be, strictly speaking, technically legal terms or such nonlegal terms as that its use in a charge might confuse or mislead the jury in the absence of such explanations and definitions.

■ It cannot be said that "reasonable profit" is, strictly speaking, a legal term, but the manner and connection in which it may be used in a special issue may be

such, and we believe it is in the case before us, one that demands an explanation, when its meaning becomes essential to the right of one of the parties.

The stipulation relied upon by defendant to relieve it of liability in this case was, in effect, that, if the sand and gravel on the leased premises should become exhausted or the quality or quantity thereof become such that the defendant could not mine it with reasonable profit, the contract could be terminated in the manner therein provided. The question of whether it could be mined by defendant with a reasonable profit was as essential to defendant's defense as any other provision in the exception. There are, of necessity, many elements that could enter into the mining of sand and gravel which would control the question of whether or not it could be done at a profit. The precise amount of profit is not a controlling factor. The question of what is a reasonable profit is one about which men may justly differ. There is nothing in the contract tending to show that the premises were to be mined in any particular way. Naturally the overhead expense incurred while mining it would have to be deducted before a profit could be obtained. If expensive machinery be used, the increased output would have to be commensurate with enhanced investment. While upon the other hand, if by the use of expensive machinery in the process the profits are absorbed in expenses, it follows that the greater the volume of output the greater would be the loss in operation. The converse of these suggestions is true; that is, if by operating with less expensive machinery and less overhead it could have been mined at a profit, the defendant would not be heard to say it could not operate the pit in the manner it chose which would prove a loss, but would be compelled to operate in such way as would produce a profit.

Upon all the facts before us, we cannot say what view the jury took of the question, when it answered the pits could have been operated by defendant at a reasonable profit. We are unwilling to assume the jury based its answers upon the proper test of what would or would not have been a "reasonable profit" in answering the issues.

We consider the case of Texas Pacific Coal & Oil Co. v. Stuard (Tex.Civ.App.) 7 S.W.(2d) 878, 882, writ of error refused, supports our conclusions here reach-

ed. In that case the question was whether or not oil wells drilled produced oil in "paying quantities." Complaint was made that the trial court should have explained by proper charge to the jury what was meant in that instance by the expression. It was there said: "In order to return a proper answer to special issue No. 9, it was essential that the jury understand the meaning of the phrase 'in paying quantities.' That phrase has different meanings under different situations. Aycock v. Paraffine Oil Co. (Tex.Civ.App.) 210 S.W. 851."

The assignments of error, complaining that the explanation was refused, must be sustained.

For the reasons given, the judgment of the trial court must be reversed and the cause remanded.

On Motion for Rehearing.

Plaintiff below (appellee here) has filed his motion for rehearing in this cause, complaining that we reversed the case because the trial court failed to give in charge an explanation and definition of the term "reasonable profit." He also asserts that the term has no defined legal meaning, and under our statutes requires no explanation or definition to enable the jury to answer the issue. We have already indicated that whether a profit, if any was made, would be reasonable or unreasonable, would become a fact issue for determination of the jury, but that of "profit," under a given state of facts, may become dependent upon legal principles. We think this is true in the instant case.

It is said in 50 C.J. 641: "The word 'profit' or 'profits,' it has been said, is elastic, ambiguous, often and properly used in more than one sense, and on the other hand it has been said to be unambiguous and to have a fixed and definite meaning, a well defined meaning, and a well defined legal meaning."

Whether the term be considered elastic, ambiguous, and often used in more than one sense, or treated as having a well-defined legal meaning, we believe a definition of the expression should be given to the jury to enable them to have some standard by which to be guided.

Supporting our views in this connection are the following authorities: Burton v. Stayner (Tex.Civ.App.) 182 S.W. 394, writ of error refused; Tooey v. Percival Co., 192 Iowa, 267, 182 N.W. 403; Crawford v. Surety Co., 91 Kan. 748, 139 P. 481; Brandenberg v. Addison, 221 Ky. 442, 298 S.W. 1091. In some of the cases above cited a definition of "profit" is given, which will prove helpful in informing the jury on the point, upon another trial.

We do not consider there is any conflict between our holding in this case and what we said in the cases of Roeser v. Coffer, 98 S.W.(2d) 275, and Watchtower Ins. Co. v. Davis, 99 S.W.(2d) 693. In the latter case we held the expression "reasonable attorneys' fees" need not be explained. The difference in the term there used and the one in controversy here and the significance of each as applicable to the issues involved is obvious.

Our views as expressed in the original opinion are unchanged and the motion for rehearing is overruled.