**BROWN et al. v. NEYLAND.**

No. 9026.

Court of Civil Appeals of Texas. Austin.

Feb. 4, 1942.

Rehearing Granted in Part and Denied in Part April 1, 1942.

Second Motions for Rehearing Denied April 29, 1942.

834.

Edgar Monteith and T. J. O'Brien, both of Houston, and Hart & Brown and Homer DeWolfe, all of Austin, for appellants.

Hardy Hollers, of Austin, and Johns, McCampbell & Snyder, of Corpus Christi, Lawler, Wood & Childress, of Houston, for appellee.

BAUGH, Justice.

This suit was originally filed in the District Court of Nueces County, in February, 1932, by O. L. Neyland against the partnership of Brown & Root, the individual members thereof, and Brown & Root incorporated, successors to the partnership. It was transferred to the District Court of Travis County in September, 1938, tried to a jury at the September, 1939, term of said court, the trial consuming twelve weeks, and judgment rendered in favor of Neyland on December 1, 1939, for $93,934.06, from which this appeal is prosecuted.

The record presented is voluminous. The transcript embraces 450 pages, and the statement of facts consists of 2,155 typewritten pages, besides voluminous exhibits, including an original and a supplemental written report made by the auditor appointed by the court to audit the books of the defendants, who, for brevity, will all hereinafter be referred to as Brown & Root.

The suit is by Neyland for an accounting and to recover, under an original oral contract between Neyland and Brown & Root made in April, 1929, relating to a road construction contract awarded by the State to Brown & Root for the construction of some 11 miles of highway in Kerr County, whereby Neyland was to superintend such construction, and in addition to a designated allowance of $200 per month was to receive one-half of the profits derived from the performance of the contract. The same agreement was alleged to have been renewed and applied to some 9 or 10 other construction projects, both public and private, performed in that section of the State during the years 1929, 1930, and 1931, one-half of the profits from which Neyland alleged had not been paid him by Brown & Root. For convenience we will consider the contentions made in the order presented by appellants, and the items involved in the various jobs will be set forth in the discussion of the issues raised relating to them.

There is little difference between the parties as to the controlling elements of the oral contract made between Herman Brown, on behalf of Brown & Root, and O. L. Neyland at Edinburg, in April, 1929. Substantially it was that Neyland should

be field superintendent of the road construction work and the performance generally of Brown & Root's contract with the State. He was to be allowed $200 per month, charged against the job, and to OK all bills for labor, material and equipment, used in the construction of the road. Brown & Root were to furnish all money, pay all bills, keep the books, furnish at a reasonable rental equipment on hand, chargeable to the cost of construction; and all additional equipment necessary to be purchased was to be charged to the cost of the job and when completed to be equally divided between Neyland and Brown & Root. Neyland was to OK all expenses for labor, materials, etc., used on the job, and Brown & Root were to charge to the job as costs thereof only items having Neyland's OK, with the exception of premiums on surety bonds, workmen's compensation, etc., which did not require Neyland's OK.

While in the performance of the road construction job Neyland investigated, made estimates, solicited, on behalf of Brown & Root, other construction jobs in this area, and procured for them several other contracts, some with Moody and Seagraves for the construction of a private road, a dam on the Johnson fork of the Llano River, an airport, a golf course, and a target range. He also secured for them with Kerr County a contract for construction of a public road from Ingram to Hunt in that County. All of these jobs were constructed during 1929, 1930, and 1931, more than one of them being carried on at the same time, and all supervised by Neyland under the same agreement he had made in April, 1929, with Herman Brown.

During the seven-year period intervening between the filing of the suit in 1932 and its trial in 1939, Brown & Root moved their Austin offices to a new location, including removal of their numerous original papers and invoices which had been boxed and stored in an Austin warehouse; and in doing so many of these old records, original invoices, etc., which Neyland had OKed were lost or destroyed, and could not be produced on the trial hereof. The auditor appointed by the court to audit Brown & Root's books consequently was unable to check as against the book entries of construction costs of the various jobs the original invoices bearing Neyland's OK. He testified, however, that as to items of construction cost charged on

their books to the several jobs for which he could not find statements bearing Neyland's OK, he took up with the various parties and concerns with whom such expenses were incurred, procured copies of invoices and statements from their books for verification against Brown & Root's books, and thus verified the entries made on Brown & Root's books, with only minor exceptions.

The total aggregate of items carried on Brown & Root's books as construction costs of these several jobs, against which Brown & Root could not, upon the trial, produce original invoices and statements bearing Neyland's OK, amounted to $34,175.37. As to these, Neyland's contention, sustained by the trial court, was that under his agreement with Brown, in arriving at a final settlement, only the items of cost (other than insurance premiums, etc.) for which Brown & Root could produce invoices and statements bearing his OK could be charged as construction costs of the several jobs, whether actually used in the performance of these contracts and paid for by Brown & Root or not. In this regard we quote his testimony:

"Q. Everything that entered into those jobs, whether it be labor or material or something else used in the performance of them, received your approval? A. That is right.

"Q. And is a proper charge against those jobs? A. That is correct.

"Q. Well, now, is it your position, Mr. Neyland, that if Brown & Root at this date can not produce invoices which have your OK on them for materials which entered into those jobs but for which they paid, that they are not entitled to a credit for the amount so paid by them? A. That is my position.

"Q. It is your position that although they paid for labor which actually went into these jobs or bought and paid for material which was used in the construction of these jobs, if they can not today produce a bill OK'd by you or a check signed by you, that they are not entitled to credit? A. Yes, sir.

"Q. That is your position? A. That is right."

Appellee both pleaded and testified unequivocally that he OKed all labor, material and equipment that was used in the performance of these several jobs. Brown & Root's bookkeepers testified that they

charged on the books as construction costs only the items which Neyland had OKed. In answer to special issues 39 and 40, the jury found that Neyland used all of the materials, equipment, labor and expenses charged on Brown & Root's books (amounting to $34,175.37) as direct construction costs in the performance of the jobs in which he was interested. Under his own testimony, he must therefore have sent to Brown & Root such statements and invoices bearing his OK. The jury also found that Brown & Root made no charges on their books for materials, etc., which were not actually used in the performance of these contracts.

Upon motion of appellee, however, the trial court rendered judgment non obstante veredicto for appellee for one-half of this $34,175.37, as profits derived from the performance of such contracts.

█ Appellee here contends, first, that because appellants did not request a jury finding on the issue whether such items carried on Brown & Root's books as construction costs, for which they had no OKed invoices, did in fact bear Neyland's OK, they waived same and it should be presumed that the trial court found against them on this issue. A complete answer to this contention is found, we think, in the testimony of Neyland himself. That is, that he did OK all labor, materials and equipment used in such construction. The jury finding that the items in controversy were in fact so used, implies a finding, under his own testimony, that he had OKed them.

Secondly, appellee contends that the evidence clearly shows that appellants' books were incorrectly kept and were therefore inadmissible as evidence of any construction cost charges; and that excluding them there was no evidence that any of these charges, not supported by Neyland's OK on original invoices, etc., were correct and therefore none should be allowed and Neyland should recover one-half of the amount of them as profits. He did, however, offer to allow as construction costs such items as he remembered, independent of appellants' books, were actually used in such construction.

It is true that changes were made in entries on appellants' books not only during the performance of the several construction jobs involved, carried separately on appellants' books, but after their completion. The evidence shows that many of these changes were due to the fact that at one time or another several of these jobs were being carried on at the same time under Neyland's supervision, and that it was not always clear from the statements sent in by him to which job items of expense should be charged. When entered as a cost chargeable to one job, and it was subsequently discovered that an item should have been charged to another, the books were corrected accordingly. Such changes, however, could not have prejudiced appellee for the reason that he was to receive one-half of the net profits derived from all of them.

█ The appellants' books, the auditor's report, and numerous documentary exhibits were offered in evidence. The auditor appointed by the court, and the several bookkeepers of Brown & Root testified at great length concerning them. Most, if not all, of the items in controversy were taken up in detail and gone into thoroughly. With all of these matters before them, the issue as to whether the items shown on appellants' books, for which no OKed invoices could be found, were correct and that such labor, materials, etc., actually were used in such construction, was one for the jury to determine. In answer to special issues 39 and 40 they found that they were, and necessarily, therefore, that as to these charges, appellants' books were correct. Consequently their findings should not be disregarded and the trial court erred in doing so.

If appellee's contention be sustained that Brown & Root's books were not admissible, because not shown to have been correctly kept by them, as evidence of construction costs, and consequently to determine the amount of profits derived from the various jobs; he puts himself in the anomalous position of relying on them himself to show the amount of the profits to which he is entitled, but that Brown & Root cannot rely upon them to show that the same entries evidence construction costs and not profits.

There was no real conflict in the testimony of Neyland and Brown as to what this original contract was. The undertaking of each under the contract is not controverted. Neyland was to be compensated for his services by payment of $200 per month, whether treated as a salary or a personal expense account, and one-half of the net profits derived from the perform-

ance of these construction contracts all made between Brown & Root and the various other parties, to none of which Neyland was a party. His compensation for each job was to be paid upon its completion. The agreement that all costs of construction must be OKed by Neyland, with designated exceptions, and that no items not bearing his OK, were to be charged as costs, was manifestly, and under the testimony, for the mutual protection of each party to the contract, to prevent imposition by either upon the other of excessive or unnecessary expenses; and as a method of safely determining costs of performance. The real objective and controlling consideration was performance of the construction contracts entered into by Brown & Root and division equally of the net profits therefrom between them. No fraud, intentional wrong, or malfeasance was charged against Brown & Root in the loss of records by which the correct amount of the construction costs was to be established. Under appellee's contention as evidenced by his own testimony, had all of their records been destroyed through fire, vis major, or other agency, without culpability on their part; and appellee could show by competent testimony the total remuneration received by them, and they could not produce any records bearing Neyland's OK, he would be entitled to recover as profits one-half of the entire proceeds paid to Brown & Root. Such a contention is manifestly without merit.

And even if it be conceded, as appellee insists, that there were some items included in the $34,175.37 total which, under the evidence, were shown not to have been for actual construction costs of the jobs involved; and to that extent the jury finding was not supported by the evidence; this would not warrant the trial court in disregarding and excluding from the construction costs all other items shown to have actually been used and to have been properly charged to the cost of construction.

The next group of propositions relate to an item of $12,837.36 deducted by the State Highway Department from the final estimates on the first road construction contract, and not paid to Brown & Root as a part of the contract price. Neyland pleaded that such sum was due Brown & Root under their contract with the State; that they negligently failed and refused to collect it from the State; and that they impliedly agreed with him at the time that,

notwithstanding their failure to collect this sum, they would credit him with one-half thereof as profits from this job. As against such an agreement, in addition to a denial, appellants interposed pleas of limitation of two and four years, predicated upon the fact that no such agreement was pleaded until 1938. These issues were submitted to the jury in answer to which they found in substance as follows:

a. That Brown & Root had agreed to credit Neyland with one-half of this uncollected $12,837.36 item (Special issue No. 3).

b. That he did not know until June 7, 1939, that they had not done so; and could not, in the exercise of reasonable diligence, have learned within either two or four years prior to that date that they had not done so. (Special issues 44, 45 and 46.)

c. In effect, that Brown & Root had so complied with the terms of their contract with the State as to earn, and were entitled to be paid, the $12,837.36, so deducted by the State. (Special issues 4-7.)

d. That Brown & Root failed to exercise reasonable diligence to collect said sum from the State; and that if they had done so they would have collected it. (Special issues 8 and 9.)

It is undisputed that there was a controversy between Brown & Root and the Highway Commission over this deduction. Neyland undertook to collect it, even going to Abilene, employing an attorney who took the matter up with Judge Ely, Chairman of the Commission. The State Highway Engineer, Mr. Gilchrist, refused to allow the item, under his interpretation of the terms of the contract, and advised Brown & Root in writing the grounds for refusal to allow the claim. Neyland's version of the controversy was that Brown & Root declined to press the claim because they feared it would jeopardize construction contracts they then had with the State and their chances to secure others. Neyland testified that when Brown advised him that he did not want to press the matter further, he told Brown that it was all right with him, provided Brown would credit his (Neyland's) account with one-half of such sum. Brown's testimony was to the effect that when the Highway Department engineers advised him in detail the bases for the deductions, which were that Neyland, for Brown & Root, had not complied with the Engineer's interpreta-

**840**

tion of the specifications in the contract, and the contract expressly made the decisions of the Engineer final in these matters, he concluded that it would be futile to try to enforce collection.

If, however, Brown & Root caused Neyland to cease any efforts to collect such deductions, and abandoned such effort themselves, under an agreement with Neyland to credit him with one-half of the disputed item, such an agreement would be binding upon them. The jury found that they did so agree. This finding is attacked, though the issue as submitted was not objected to by appellants, on the ground that a judgment based thereon is without support in the pleadings, in which only an implied agreement was alleged.

Since appellee alleged that he was entitled to recover one-half of this uncollected sum of money under an *implied* agreement made with him by Brown that Brown & Root would so credit him, the burden was upon him to prove such an agreement. He nowhere alleged, nor did he so testify, that Brown expressly agreed to do so. His claim, in this regard, was predicated upon a conversation he testified that he had with Herman Brown in 1930, in which he demanded that Brown & Root so credit him, if they were going to abandon any further prosecution of such claim against the State; and a noncommittal reply of Brown to such demand. This conversation Brown denied. Since there were neither pleadings nor evidence of an express agreement, he must recover, if at all, upon the implied agreement pleaded; and the elements of an *implied* agreement were not submitted to nor found by the jury. San Antonio Machine & Supply Co. v. Central Texas P. & T. Co., Tex.Civ. App., 295 S.W. 229; Meier v. Schoenfeld, Tex.Civ.App., 68 S.W.2d 587; Stephens v. Mills County, Tex.Civ.App., 113 S.W.2d 944; 10 Tex.Jur., § 302, p. 518. Nor does the holding in Farmers' State Bank & Trust Co. v. Gorman Home Refinery, Tex.Com. App., 3 S.W.2d 65, alter this rule. Issues submitted without support in the pleadings cannot sustain a judgment; and can be first raised after judgment as fundamental, though not objected to on that ground when submitted. Dominguez v. Garcia, Tex. Com.App., 53 S.W.2d 459; Holsomback v. Taylor, Tex.Civ.App., 61 S.W.2d 544; Shary v. Helmick, Tex.Civ.App., 90 S.W. 2d 302.

Appellants also contend that their plea of limitation to this item should have been sustained in that it amounted, so far as this particular item was concerned, to a novation of the original contract, was alleged to have been made in 1930, but such agreement and its breach were first pleaded in 1938. We do not, however, so construe it. Appellee's action, on the whole, was for an accounting as to all transactions. The $12,837.36 item, alleged to be properly a part of the profits arising from this particular job, was but a part of the whole, and the agreement alleged that Brown & Root, though waiving collection thereof from the State, would so treat it in settling with Neyland, could have been shown under his original petition whether specifically pleaded or not, if in fact and in law it constituted profits. Neyland alleged and testified that he did not know, because Brown & Root had denied him access to their books, until the auditor's report was filed in 1938, that they had not so credited him on their books. Because of the relationship of the parties, which was essentially fiduciary, denial by Brown & Root to Neyland of the only opportunity he could have had to ascertain whether they had complied with such agreement, if made, as the jury manifestly found that they did, would we think be sufficient to toll, if applicable, the statutes of limitation; or at least to estop Brown & Root from asserting such plea against Neyland. And this is true whether the relationship between Neyland and Brown & Root be treated as a partnership, as a joint adventure, or as that of employer and employee. If a determination of such relationship be necessary, we are clear in the view that it was merely one of employment. It was not the launching by the parties of a business venture. Brown & Root already had a road construction contract with the State which they were bound to perform. Neyland was not, and could not have been held, liable in any manner for the performance or failure to perform it. Under his own testimony he was merely *employed* to superintend the performance of this contract by Brown & Root. He was in no sense privy to the contract with the State, nor could he have collected anything from the State by virtue of his contract with Brown & Root. His interest in such profits as accrued, in addition to his $200 per month, was entirely as compensation for his services, and not as half owner of the

profits from a joint enterprise. He was, therefore, under the holding in Strawn Natl. Bank v. Marchbanks, Tex.Civ.App., 74 S.W.2d 447, 449, writ refused, and in Mangum v. Turner, Tex.Civ.App., 142 S.W.2d 951, 953, but an employee of Brown & Root, and not a partner.

A second ground for recovery of one-half of said sum as profits, independent of the agreement above discussed, is predicated upon the alleged negligence of Brown & Root in failing to collect same as a valid claim against the State. To this question appellants devote 17 propositions which go into this issue in various detail. We shall not undertake to discuss these numerous contentions made.

In addition to the agreement pleaded, Neyland alleged various grounds as constituting a compliance by Brown & Root with their contract with the State; that they had earned under the contract the total amount deducted by the State from the contract price; and that Brown & Root could, in the exercise of reasonable diligence, have collected it. Second, that their waiver of such claim amounted to an expenditure by them from the profits of the job of said sum for their own use and benefit to secure the good will of the Highway Department on pending and prospective contracts with the State. The latter contention was in no wise submitted to the jury, nor found by the court, and need not be discussed.

The deductions made, aggregating the $12,837.36 item, were made after a full investigation by the Highway engineers, an opportunity given Neyland and Brown & Root to be heard thereon, a full hearing had, and the claim refused by the State Highway Engineer. They were for quantities of stone hauled and used for the base of the road which Neyland claimed were used, but which the engineers found were not; and for additional long hauls claimed by Neyland to have been made, which the Engineer disallowed as not being authorized under the specifications of the contract. It affirmatively appears, however, that under the express terms of Brown & Root's contract with the State, the determination of all such matters was vested specifically and exclusively in the Engineer; and further that "the Engineer will act as referee in all questions arising under the terms of the contract between the parties thereto, and his decision shall be final and binding."

The Supreme Court has definitely determined that the Engineer's decision in such case is final and conclusive "unless in making it he is guilty of fraud, misconduct, or such gross mistake as would imply bad faith or failure to exercise an honest judgment." Nor can his decision "be impeached simply on a conflict of evidence as to what he ought to have decided." City of San Antonio v. McKenzie Const. Co., 136 Tex. 315, 150 S.W.2d 989, 996; Austin Bridge Co. v. Teague, Tex., 152 S.W.2d 1091, 1093. There are neither allegations nor proof by Neyland of any grounds which, under the record here presented, would have set aside the Engineer's decision, rejecting Brown & Root's claim for the amount so deducted. That being true the findings of the jury on the issue submitted, whether objected to or not, in effect that Brown & Root had furnished the stone and made the hauls for which compensation was claimed "in substantial compliance * * * with the terms of the contract between Brown & Root and the State Highway Department" (manifestly a mixed question of law and fact, if not clearly a question of law); nor their finding in answer to special issue 41 that the "State Highway Department owed and should have paid to defendant Brown & Root the sum of $12,837.36 * * *" deducted by the State from the contract price (clearly a legal conclusion reached by the jury), can afford no basis for a judgment for half of said sum as profits.

Even in instances of partnership accounting the general rule is that uncollected notes, claims, accounts, etc., cannot be treated as profits until they are collected, unless the loss thereof or failure to collect is due to some fault of the party charged. Central Natl. Bank v. Cox, Tex.Civ.App., 96 S.W.2d 746; Gillean v. Bennett, Tarlton & Co., Tex.Civ.App., 264 S.W. 229. No such relationship existed between appellants and appellee, and as employers Brown & Root, in the light of the deductions made by the Highway Department and its definite and final refusal, made in good faith, to pay same, owed to Neyland only the exercise in good faith of an honest judgment as to whether they should attempt by suit to collect such claim. In the light of the facts above recited, the grounds on which the Highway Engineer made the deduction, the provisions of their contract with the State, and the further fact that a suit against the State would require legis-

lative consent, recovery of a judgment, and legislative appropriation approved by the Governor to pay such judgment, it cannot be said that Brown & Root did not exercise an honest judgment, if indeed not a sound one, in declining to attempt to enforce such claim against the State.

The next item involved is one of $5,000 which the jury found Neyland had spent for the use and benefit of Brown & Root in connection with other jobs than those in which Neyland was interested, but charged to jobs in which he was interested, and for which Brown & Root had not given him credit. Appellants attacked this item by special exception to appellee's pleading of same; and the jury finding as without support in the evidence.

As to this item appellee pleaded: "Plaintiff further alleges that during the years 1929, 1930 and 1931, at the request of and for the benefit of the Defendant, Brown & Root, Inc., he expended numerous sums incurred as expenses incident to and necessary in obtaining information and making estimates to enable said Defendant to secure the award of contracts for construction jobs and contracts upon which they desired to submit competitive bids, which sums so expended, Plaintiff is entitled to recover from said Defendant, Brown & Root, Inc. The specific amounts and dates of such expenditures Plaintiff is unable to state, but alleges upon information and belief that the aggregate of such sums for which he is entitled to credit upon an accounting and settlement is, to-wit: $5,-000.00; that the facts relative to these expenditures are or should appear in the books, cancelled vouchers and memoranda, all of which are in the possession of said Defendant and which such books, cancelled vouchers and other evidence of such expenditures by this Plaintiff, Plaintiff now calls upon the Defendants to produce at the trial hereof, otherwise, Plaintiff will resort to secondary evidence for the proof thereof."

This pleading was excepted to on the grounds that it was so vague and indefinite that it neither informed appellants what proof appellee would offer thereunder, nor did it suffice as a pleading to authorize any proof.

It clearly appears that in addition to the services of Neyland, under the Edinburg agreement, he did, at Brown & Root's request, investigate, make estimates, report upon and appear before the Highway Commission in connection with other road construction projects during the period alleged. Apparently this was done in contemplation that if Brown & Root were the successful bidders and secured such contracts, he would continue to supervise their performance under the original agreement. Such services of Neyland, in connection with other prospective jobs, did not come within the terms of the Edinburg agreement. There was nothing in his pleading to put appellants upon notice as to where, when, and in connection with what jobs such expenses were incurred, what items were claimed nor the amount of such items. It affirmatively appears that during the period involved numerous contracts were let by the State on many of which Brown & Root were bidders. Neyland's testimony as to items going to make up the $5,000 claimed was as about as indefinite as his pleadings; and the aggregate stated by him was purely an estimate. He testified that he kept written memoranda made at the time of most of such items but that he had lost same and could not produce them at the trial. Since Brown & Root undertook to keep books on such items, it was their duty to segregate from the jobs in which Neyland was interested with them, expenses incurred on other prospective contracts. In a suit by him to recover such items we think it was incumbent upon Neyland to apprise them by pleadings sufficiently specific to give them reasonably definite information as to the basis of his claims, and to enable them to ascertain from their books, or from other sources, the character and amount of such claimed expenditures. There was no definite proof on the trial as to specific items claimed by Neyland, nor the amount thereof; and the round sum of $5,000 found by the jury was manifestly but an approximation based upon Neyland's general estimate that he had so expended that amount. Since some of these expenditures were made by him, according to his own testimony, from his own personal funds, and some from moneys furnished him by Brown & Root, and were not connected with the jobs in which he was interested, it was not enough for him to say to Brown & Root that I claim to have expended for your benefit and at your request, over a period of more than two years, an aggregate sum of $5,000; and unless you can prove the contrary, I am entitled to a judgment so declaring. Under

his own testimony we think it is clear that he could have alleged much more specifically when and where the claimed expenditures were made; and that he has not brought himself within the rule excusing him from doing so. See Schneider v. Ferguson, 77 Tex. 572, 14 S.W. 154; Negociacion, etc., v. Love, Tex.Civ.App., 220 S.W. 224; 33 Tex.Jur., § 40, p. 457.

The next question presented is whether or not Brown & Root were entitled, in calculating the costs of these various jobs superintended by Neyland, to charge to same a reasonable percentage of their overhead costs of operation. It is not controverted that this item of expense was not mentioned in arriving at the Edinburg agreement on job No. 5, the first road construction job. In that case, Brown & Root already had the contract with the State, and the overhead costs of procuring that contract had already been incurred when the agreement was made with Neyland. As to the nine other jobs subsequently obtained, however, this was not the case.

On the issues submitted to them the jury found that Neyland knew when he made the Edinburg agreement that Brown & Root had necessary overhead expenses in their business which could not reasonably be charged as a direct cost of the performance of any particular contract. They also found that in making that agreement Neyland did not understand and intend that such percentage of overhead should be charged as costs of performing said contract in ascertaining the profits; but that Brown understood and intended that they should. Consequently there was no meeting of their minds on this particular element of costs of construction. It is not disputed that Brown & Root, in submitting bids, included therein a reasonable percentage of overhead costs as a part of costs of construction, and the jury found that to be 10.85%. It was also shown that this was a uniform and proper item of construction costs included by practically all contractors for public works.

 Appellee insists, however, that such item of expense cannot be allowed because the jury found (a) that only items bearing Neyland's OK could be so charged as costs of construction; (b) that Neyland did not agree to such a charge; and (c) that no overhead expenses should be charged by appellants to the costs of performing these various contracts. This last finding cannot be deemed a fact find-

ing. The province of the jury is one of fact finding only. They may properly find what the agreement of the parties was; but the rights of the parties under such a contract involves a question of law beyond their province.

It is true that the jury did find from the testimony of Neyland that only costs bearing his OK were to be charged as construction costs. But as above discussed, we do not think that such a restricted interpretation of the agreement between appellants and appellee should be permitted to defeat or destroy the true purpose of the contract. This was, that Neyland should superintend the performance of Brown & Root's contract with the State and receive as compensation one-half of the profits derived therefrom. Profits in the instant case would be the difference between the total due from the performance of the contracts and the necessary costs of such performance. A mere stipulation as to the method of computing such profits should not be permitted by a narrow and restricted application of such method to convert into profits that which in law and in fact does not constitute profits, a division of which was the controlling consideration of the contract. If Brown & Root incurred, as they necessarily did, and actually paid out in advance in order to secure such contracts 10% of the amount thereof, and included such costs in their bids, the moneys so paid out by them cannot be deemed to be profits in the true meaning of that term. To so hold, would not be an equal division of the profits between Neyland and Brown & Root, but an award to Neyland of 55% of the actual profits therefrom and to Brown & Root only 45%. This, notwithstanding the fact that Brown & Root bore all expenses, all liability to the State, furnished all the money, labor and materials for the performance of the contract; and took all the losses in case there were any.

 Since the real and controlling consideration for the Edinburg agreement was a division of the actual profits from such job, we think that a proper determination of what in law constituted such profits should prevail over any restricted or limited understanding by Neyland of how such profits were to be calculated. It being clear that the minds of the parties had not met on the question of reasonable deductions of overhead costs, to be allocated to such jobs, one party intending

that they should, and the other that they should not, the court should give such contract a reasonable construction in the light of the situation of the parties, the surrounding circumstances, and the end sought to be accomplished. One which would be reasonable and fair to both parties and which would work no undue hardship on either. Marathon Oil Co. v. Edwards, Tex.Civ.App., 96 S.W.2d 551; Munger v. Waggoner, Tex.Civ.App., 260 S.W. 696; Woods v. Postal Telegraph-Cable Co., 205 Ala. 236, 87 So. 681, 27 A.L.R. 834; 17 C.J.S., Contracts, § 319, p. 739; 12 Am.Jur., § 250, p. 791.

Thus the elements of costs entering into determination of profits consisted of overhead, or expenses of operation, as well as field costs in doing the actual work on the ground. The latter were manifestly the only ones Neyland had in‚ mind; while Brown intended that both be included. To consider only the latter would be unjust and unfair to Brown & Root. To take both into account would not only be fair to both but would be the proper method in determining what both parties obviously intended to do,—that is to divide the actual profits derived from performing the contracts.

We do not undertake to determine whether the deductions made by Brown & Root for such overhead were reasonable; nor whether they included only proper items of expense in arriving at the percentage allocated to these jobs. The trial court refused to allow any deductions for overhead expenses. This, we think, was error.

 The next question presented is whether Neyland was entitled to one-half of the profits derived from the topping work done on job No. 5, totaling $14,758.-60. It appears to be uncontroverted that in the negotiations resulting in the Edinburg agreement Brown demurred to including the topping work in the profit sharing arrangement on the ground that Brown & Root already had a complete topping crew, materials and equipment, and an experienced superintendent for that particular type of work. Neyland testified that the topping job was unconditionally included in their agreement, and that he did superintend that portion of the job also. There was ample evidence to show, however, that Neyland was to share in the profits from the topping only on condition that he could screen out from the rock crushed for the base a sufficient amount of small stone to

top the road, and place same along the edges of the road for that purpose. This he undertook to do. However, the Highway Engineer stopped such screening out process as not being authorized under the contract with the State; because by removing the small stone and placing only the large ones on the base the result was that when rolled and compacted more loads of crushed stone were required to give it the specified thickness than would have been required had the small stone not been removed by screening. It was the decision of the Engineer that this was not authorized under the contract, and if allowed would result in additional and unauthorized costs to the State. It is not improper here to note that this unauthorized scalping, as it was designated, by Neyland of such screenings from base crushings, and the necessity of additional yardage to be added to bring the base to the required thickness after it was rolled and compacted, was the basis for the deduction by the Highway Department of much of the $12,835.37 item above discussed.

The jury found, in answer to special issue No. 1, that the topping work was included in the work to be performed by Neyland; and in answer to special issue 21 that Neyland "superintended and managed the laying of the topping on job 5." They also found in answer to special issues 31 and 32 that Neyland's right to participate in the profits from such topping job "was conditioned upon plaintiff Neyland screening all of the stone which was to be used in said topping out of the stone crushed for the base of said road"; and that he did not do so.

The trial court disregarded the findings on issues 31 and 32, and gave Neyland judgment for one-half of the profits from the topping work, apparently on the basis of their answers to issues 1 and 21. In this, we think the trial court erred. It is immaterial whether he superintended the topping work or not (though the evidence strongly indicated that he did not), if his right to share in the profits therefrom depended, as the jury found, on his screening from the crusher run of the base stone, a sufficient amount of small stone to do the topping. This he was conclusively shown not to have done.

 Nor can the answers to issues 31 and 32 be disregarded, as insisted by appellee, on the ground that such condition in the contract was not pleaded by Brown &

Root. They were entitled to such submission under their general denial. Gifford-Hill & Co. v. Jones, Tex.Civ.App., 99 S.W. 2d 656, and cases therein cited; 10 Tex. Jur., § 294, p. 506. This case does not fall within the rule announced in Wooters v. International & G. N. R. Co., 54 Tex. 294, and Ft. Worth Sand & Gravel Co. v. Peters, Tex.Civ.App., 103 S.W.2d 407, relied upon by appellee. Those cases involved contracts valid, binding and enforceable from their inception, but subject to modification or alteration on condition of a future event. This part of the contract depended entirely, and any liability under it was determinable by, the occurrence of the condition stipulated. In brief, it fixed no liability, unless and until the prescribed conditions were met.

Nor do the answers to special issues 31 and 32 conflict with the answer to special issue 1. Brown did not deny that he finally agreed to include the topping work with the rest of the job, after Neyland insisted that he could scalp from the base crushings sufficient screenings to lay the topping; but agreed only on the condition that he do so. Such findings, therefore, were only supplementary to the answer to issue 1, and merely found the facts to be what the evidence showed they were.

The next item involved is one for $37,-500 for one-half of which the trial court rendered judgment for appellee as constituting profits from the W. L. Moody III job. Neyland negotiated and executed this contract on behalf of Brown & Root. The contract gave Brown & Root the option, to be exercised prior to June 25, 1930, to accept from Moody as part payment for this job 3,750 shares of Saxet stock at $10 per share. This option was not exercised. After the Moody jobs were completed, and payment requested Moody sent to Brown & Root by mail on February 18, 1931, 3,-750 shares of said stock, stating in his letter of transmittal that it was sent according to contract. Brown & Root neither accepted nor rejected the stock, but sent Neyland to Galveston on April 1, 1931, to settle Moody's account. Brown testified that he sent this stock back by Neyland. Neyland denied this. At Galveston Neyland dealt with a J. F. Reed, Moody's representative, made a full settlement with him whereby Neyland accepted for Brown & Root the 3,750 shares of Saxet stock at $10 per share, a check for $30,758.61, and gave Moody a receipt in full of his account, signed, "Brown & Root by O. L. Neyland, Authorized Agent." At the same time an agreement was prepared by Reed, and we think was conclusively shown to have been executed with the full knowledge of Neyland, though he denied such knowledge on the trial, giving J. F. Reed and Neyland an option to buy from Brown & Root prior to noon April 15, 1931, said stock at $10 per share; and if that option were not exercised then giving to Reed an option for 90 days to buy it at $11 per share. Neyland and Reed exercised their option on April 15, and Brown & Root agreed to it, but the sale was never consummated. Reed did not exercise his 90-day option. The Saxet Company subsequently collapsed, another concern took it over and issued new stock to stockholders in lieu of the Saxet stock, which new stock Brown & Root claims to have sold to George Brown, a member of the partnership originally, and subsequently a stockholder in Brown & Root incorporated, for $1,106, for one-half of which they gave Neyland credit.

After Neyland had settled with Moody, had given him a receipt in full, and had accepted for Brown & Root the 3,750 shares of stock at $10 per share, Brown & Root entered on their books on April 7, 1931, credit on the Moody account as "Stock Received" $37,500. Neyland's contention is that having received and accepted said stock in lieu of $37,500 cash, and having retained the stock as their own, he is entitled to have credited to him one-half of that sum as profits, regardless of the value of said stock or what Brown & Root thereafter did with it.

Three issues, other than those relating to the option of Neyland and Reed to purchase said stock, were submitted to the jury in answer to which they found: 1. That Brown & Root "received" from Moody 3,750 shares of said stock "in lieu of the payment of $37,500 by said W. L. Moody III for the performance of the Moody dam job" (special issue 10); 2. That they "credited the receipts and revenues of the Moody dam job with the sum of $37,500.00 as representing the value of 3,750 shares of Saxet stock" (special issue 21); and 3. That they did so "with the intention that Brown & Root, Inc., should own such stock to the exclusion of Plaintiff Neyland" (special issue 22).

■ Under the view we take, we think these issues do not afford a basis for the judgment rendered. None of these findings were in reality controverted. Brown testified that he "received" this stock from Moody on February 19th, was not willing to accept it as money and immediately took the matter up with Neyland. That Neyland agreed to take the matter up with Moody and get it adjusted. This he did on his trip to Galveston, under circumstances which Brown concluded, according to his testimony, and we think properly so, would bind Brown & Root to accept such stock as cash, whether they had authorized Neyland to do so, or not. Consequently there was nothing for them to do, on their books, but to enter the value agreed upon by Neyland, as closing the Moody account. They either had to do that or repudiate Neyland's action. The same would have been true had Neyland validly accepted any other property instead of cash from Moody. In such case the determination of profits, vel non, from the performance of the contract would depend upon the value of the property, and not upon a book entry balancing the account, in the absence of an agreement with Neyland otherwise. While Neyland did by trial amendment plead an implied agreement between him and Brown & Root that they would credit him, for purposes of arriving at such profits, with one-half of this $37,500 item, no such issue was submitted, nor requested to be submitted, to the jury, and will be deemed to have been waived by Neyland.

■ Nor is the jury finding that Brown & Root accepted same with the intention that they should own it to the exclusion of Neyland material. Neyland being an employee, and not a partner, their ownership of such stock would follow as a matter of law in the absence of a specific agreement otherwise. The intention to do so would neither add to, nor detract from, these legal consequences. Whether they accepted it willingly upon Neyland's Galveston settlement, or had it foisted upon them by Neyland in such a way that they could not repudiate his action on their behalf, the stock became their property, whatever its worth. If Neyland and Reed had carried out their purchase agreement of April 15, 1931, he would have become joint owner with Reed of all of this stock; and if, as he insists the evidence showed, the stock was then worth more than $10 per share, he could have sold it at a profit. But under the Galveston agreement, which, if not initiated by Neyland and Reed, was manifestly made with Neyland's knowledge and consent and concurred in by him, Reed was to have 90 days from April 2, 1931, within which to purchase this stock from Brown & Root at $11 per share. Disposition of this stock by Brown & Root to someone else prior to the expiration of this 90-day period, would have been at their own risk. If the situation thus created, if not by the conduct of Neyland at least with his full knowledge and consent, resulted in the loss in value of the stock during this 90-day period, he should not be permitted to now claim as profits the value at which he accepted the stock on behalf of Brown & Root on April 2, 1931.

■ If Brown & Root in continuing to hold said stock, and in disposing of it through subterfuge or for less than its value had acted fraudulently, or in bad faith, or with such negligence or disregard of Neyland's rights as to amount to bad faith, a different question would be presented. But no such case was pleaded nor submitted to the jury. In the absence of such, or of an agreement made between Neyland and Brown & Root otherwise, we think such stock, in determining profits from the enterprise, should be treated in the same category as notes, accounts, or other personal property.

Appellants' next group of propositions relate to the auditor's reports. They assert error of the trial court in refusing to admit such reports in evidence as official reports and as complying with Art. 2292, R.C.S.; and in permitting appellee, by trial amendment, to allege and prove additional items of gasoline tax refunds, outside of and in addition to those shown in the auditor's report without first filing, before trial, exceptions to such portion of the reports.

When the auditor's reports were offered in evidence, some two weeks after the trial began, appellee objected to the admission thereof on the grounds that they were not properly verified. This notwithstanding the fact that he had in his pleadings expressly adopted portions of said report as a basis for his recovery. While the trial court refused to admit same as official reports, it did admit them as evidence in connection with the testimony of the auditor who testified at length on the numerous

items contained in these reports, the source and reason for their inclusion therein, in explanation thereof, and of the manner and extent his investigation of same.

We think the verification of the auditor was in substantial compliance with Art. 2292 of the statute. It followed the language of the statute, but added that same was "subject to the comments and qualifications expressed on pages one to nine of the original report and on pages one to seven of the supplemental report." We have examined the contents of these pages and find that they are not in derogation of the detailed statements of the accounts between the parties nor of revenues and expenditures therein shown; but are only a recapitulation in the aggregate of the various jobs involved, explanatory of the method of arriving at same, and showing the sources of information from which such results were compiled. The reports show an exhaustive examination made by the auditor, a proper refusal on his part to pass upon the contracts involved, and as setting out data from which the court could determine the proper amounts due the respective parties after determining the disputed issues, e. g., those of overhead, whether the topping on job No. 5 was included, the item deducted by the State, the Saxet stock, etc. Clearly this was the proper method of presenting such report. Coke v. Bargaimes, Tex.Civ.App., 116 S.W.2d 904, 907; 36 Tex.Jur., § 8, p. 691. We think that the verification was clearly sufficient and that the reports constituted official auditor's reports within the purview of the statute. Both under the express language of the statute and of the decisions the items contained therein could not properly be contradicted without specific exception thereto filed before the trial. 36 Tex.Jur. § 9, p. 691. This was not done by appellee on the gasoline refund item, but since appellants in their brief admit that appellee was entitled to the amount awarded by the court on this item and ask that it be allowed, this error is deemed to be waived.

Other contentions are presented by appellants relating to the admission of certain testimony complained of and to argument of counsel. They not only do not appear to be supported by assignment of error, but need not occur upon another trial and are not deemed to be of such importance as to further prolong this opinion by a discussion of them. What we have discussed disposes of the material issues involved; and likewise renders unnecessary a discussion of the cross-assignments of appellee relating to specific items which he claims should have been included in the judgment.

For the reasons stated the judgment of the trial court is reversed and the cause remanded for another trial.

Reversed and remanded.

### On Motions for Rehearing.

Both appellants and appellee in their motions for rehearing urge that the trial court's judgment embodies at least six severable and distinct causes of action, the appellants insist that as to some, if not all, the trial court's judgment, under the jury findings or the undisputed facts, or both, should be reversed and rendered; and appellee insists that as to some, if not all, the trial court's judgment should be affirmed; and that instead of a remand generally, the issues should upon such remand be limited only to those not already properly and finally adjudicated, as authorized by Rule 434 of the Texas Rules of Civil Procedure. This, manifestly, in the interest of economy of time and labors of the trial court, and costs to the litigants. We have so concluded, have accordingly re-examined the record, reconsidered the items involved, and so modify our former order herein.

Considering first the item of $34,175.37, the aggregate as shown by appellants' books of costs of construction of the several jobs involved, for which Brown & Root could produce no invoices bearing Neyland's OK, we see no reason why it should again be litigated. It involved an extensive examination of the books of appellants, detailed items charged and the testimony of the auditor and the bookkeepers with reference thereto. Neyland testified that he Oked *all* cost items for such jobs, and the bookkeepers testified that they entered *no* items as costs which did not bear his OK. The jury found obviously upon this testimony that *all* items charged on appellants' books were actually used in such construction in these several jobs. The mere fact (relied upon by appellee as not affording proof to sustain such finding) that some items were charged to one job which should have been charged to another, and that some did not specifically indicate the exact material, labor, etc., they represented, does not detract from the jury finding, nor does it

prejudice the rights of appellee. His interest in all of these jobs was the same,—to participate in the profits therefrom. If *all* of these items, as the jury found, constituted costs of construction, they could not constitute profits, and a failure to properly allocate them on the books of appellants to the different jobs, cannot make them so. Under the jury finding, therefore, appellee was not entitled to credits of them as such.

On the $12,837.36 item we have, upon a re-examination thereof, concluded that we were in error in holding that the jury finding in answer to special issue No. 3, that Brown "agreed" to credit Neyland with one-half of same was not sustainable for the reason that only an "implied agreement" was pleaded. It is not controverted that after Brown had turned this claim against the State over to Neyland to collect, and Neyland had undertaken to do so, Brown requested him to discontinue such efforts. Under the facts proven, it is clear, we think, that Brown & Root, under the cases cited in our original opinion, could not have enforced collection thereof. But if they agreed with Neyland to credit him with one-half of same on condition that Neyland abandon all efforts to collect same, they would be bound by that agreement. Neyland testified that he made such demand, and that Brown replied, "Well, if that is what it had to be, that would be the way it would have to be."

While only an implied agreement was pleaded, no objection was made by appellant to the issue as submitted, nor any request made to define the term "agreed" as used therein. The appellee pleaded the facts relied upon as constituting such implied agreement. If the minds of the parties met, if Brown assented to Neyland's demand, then a contract resulted. If the facts were such that the law implied an assent, then an agreement resulted which would bind Brown & Root as effectively as if express assent had been given. While confusion has resulted from failure to distinguish between contracts "implied in law" and contracts "implied in fact," it now seems clear that the only distinction between express contracts and contracts implied in fact is in the character of proof required to show how mutual assent is manifested. The determining factor therefore is whether such agreement is made, not how it is arrived at. Miller v. Miller, Tex.Civ.App., 292 S.W. 917, writ refused;

12 Am.Jur., § 4, p. 498; 17 C.J.S., Contracts, § 4, p. 317. In the absence of any objection to the issue as submitted or of any request for definition or explanation of the term "agreed" in the light of the evidence; we have concluded, upon reconsideration thereof, that under the issue as submitted the jury could find, from the language and conduct of the parties, that such agreement was made.

On the issue of limitation pleaded by appellants as barring Neyland's recovery under such a contract, we adhere to the conclusions reached in the original opinion. See 28 Tex.Jur., § 61, p. 144; 34 Am. Jur., § 230, p. 186. The trial court's judgment as to this item should therefore be sustained.

As to the $5,000 item, if, as alleged, appellee had expended such sum, and could make proper proof thereof, outside of the terms of his contract with Brown & Root, and on other work than that included in the terms of such contract, it could not, of course, be charged as costs of construction of the jobs covered by the contract, nor included therein for purposes of arriving at profits therefrom. Since the trial court overruled appellants' exception to the insufficient pleadings, and appellee was not given an opportunity to amend such pleadings, he should upon reversal be given an opportunity to do so.

On the item of overhead expenses, the finding of the jury that Brown & Root included in their bids an added 10.85% to cover overhead, cannot be construed as a finding that such amount was reasonable. And their findings in answer to issues 42 and 43, in effect, that no part of Brown & Root's overhead expenses for the years 1930 and 1931 should be charged to any of the jobs in which Neyland was interested, obviously, under our conclusion that a reasonable overhead should be included in construction costs, was not a fact finding but involved a construction of the contract. The province of the jury in such case was not to determine whether overhead should be deducted as costs of construction; but to determine, if the amount be disputed, what would be a reasonable amount of such overhead to be allocated to the jobs involved.

Under the conclusions reached in our original opinion as to the topping work done on Job No. 5, the first road construction contract, the trial court should, upon the findings of the jury, have rendered judg-

ment that as to this item, appellee take nothing.

We do not deem it necessary to further discuss the Saxet stock transaction, involving the $37,500 item, fully considered in the original opinion.

Appellee also calls our attention to an item of $3,077.19 consisting of gasoline tax refunds, one-half of which was due Neyland and awarded him in the judgment, concerning which there was no controversy, and the only question raised with reference to it was waived by appellants. This portion of the judgment should not therefore be disturbed.

In accordance with the foregoing conclusions, taken in connection with the original opinion herein, and in accord with the contentions of both appellants and appellee in their motions for rehearing that the various items above considered constitute severable causes of action, our order reversing and remanding the cause generally is set aside, and the following disposition made of this appeal:

The following portions of the judgment in favor of appellee against the appellants are affirmed, viz:

1. Judgment for $9,981.05, being one-half of the amount deducted by the State Highway Department from the contract price for construction of what was designated as Job No. 5, together with interest accrued thereon to the date of the judgment.

2. That O. L. Neyland is entitled to credit for $2,814, consisting of one-half of the gasoline tax refunds, $300 advanced by him in connection with the LaSalle County gravel pit, and $50 advanced by him for pay rolls.

3. That portion of the trial court's judgment decreeing that plaintiff, O. L. Neyland, take nothing against the defendants on his claim to an interest in the profits from the Edwards County road construction contract, designated as Edwards County Job No. 3.

The following portions of said judgment are reversed and judgment here rendered in favor of appellants against appellee:

1. That portion of the trial court's judgment aggregating $34,175.37, wherein the trial court found and decreed that no items of cost should be charged against the jobs in which plaintiff was interested unless such items of cost were represented by invoices bearing the OK of plaintiff.

2. That portion of the trial court's judgment which awarded plaintiff a one-half interest in the profits derived from topping the road on what was designated as Job No. 5 in Kerr County.

In all other respects the judgment of the trial court is reversed and the cause, except as above indicated, is remanded for another trial.

The motions of both appellants and appellee, to the extent above indicated, are granted; in all other respects they are overruled.

Motions granted in part and in part overruled.